

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00055-CV

_____

SETH BOOKOUT, LESLYE ROMERO, AND RYAN GALLAGHER, Appellants

V.

JONATHAN SHELLEY AND STEDFAST BAPTIST CHURCH, Appellees

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-329494-21

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

In this accelerated interlocutory appeal, Appellants Seth Bookout, Leslye Romero, and Ryan Gallagher challenge the trial court's denial of their motion invoking the Texas Citizens Participation Act (the TCPA or the Act)[1] by which they sought to dismiss the lawsuit filed against them by Appellees Jonathan Shelley and Stedfast Baptist Church.

This case involves an internecine battle for control of Stedfast. In September 2021, Appellants, claiming that they were Stedfast's duly elected board of directors, purported to terminate Shelley as pastor and seized control of Stedfast's bank accounts. In response, Appellees filed this lawsuit in which they seek a declaratory judgment that, among other things, Appellants are not, in fact, directors of Stedfast and have no authority to act on its behalf. Appellees also allege causes of action for conversion and defamation.

Appellants moved to dismiss Appellees' suit under the TCPA, asserting that Appellees' defamation claim violated Appellants' exercise of the right of free speech and that their causes of action for declaratory relief and conversion violated Appellants' right of association. Appellees responded to the motion by filing affidavits and documentary evidence that they argued established a prima facie case for each essential element of their claims against Appellants. The trial court denied

---

[1]Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011.

Appellants' TCPA motion and, finding that it was frivolous or filed solely for the purpose of delay, awarded attorney's fees to Appellees.

On appeal, in addition to challenging the trial court's denial of their TCPA motion and its award of attorney's fees to Appellees, Appellants assert for the first time that—based on the ecclesiastical abstention doctrine—the trial court lacks subject matter jurisdiction over Appellees' causes of action.

We conclude (1) that, though certain statements relied upon by Appellees may not form the basis of a defamation claim pursuant to the ecclesiastical abstention doctrine, the trial court has subject matter jurisdiction over all of Appellees' causes of action and (2) that the trial court's ruling on Appellants' TCPA motion was correct. The first part of this opinion focuses on our conclusion that the ecclesiastical abstention doctrine does not bar the adjudication of Appellees' claims. In the second part—employing the TCPA's three-step process—we demonstrate that, though Appellees' claims are subject to the strictures of the TCPA, they should nevertheless be allowed to proceed because they appear to have merit. Accordingly, we will affirm the trial court's order.

## II. Background

### A. Stedfast's History and Disputed Leadership

In 2014, Benjamin Romero, the former husband of Appellant Leslye Romero, formed Stedfast Baptist Church as a nonprofit corporation for religious, educational, and charitable purposes. Mr. Romero served as the church's original pastor and as a

3

member of the initial board of directors, which also included his then-wife Leslye and Robert Starnes. In January 2019, Mr. Romero was compelled to resign as both pastor and director of Stedfast due to inappropriate conduct.

After Mr. Romero resigned, Shelley was installed as the replacement pastor of Stedfast in January 2019. Around this time, Stedfast's existing board of directors purportedly executed a document removing themselves as directors and appointing Shelley, Ryan Urbanek, and Kevin Edelmann to replace them effective January 1, 2019. However—though she admits the document contains a signature resembling her own—Mrs. Romero denies ever signing this document, and prior to September 2021, no public announcement or corporate filing was ever made to commemorate this supposed change of leadership.

In September 2021, Mrs. Romero, apparently believing she was still a member of the board, purported to call a special meeting of Stedfast's board of directors via Zoom videoconference.[2] At this meeting, Mrs. Romero purported to appoint Appellants Bookout and Gallagher as directors, and then Appellants collectively, as the newly constituted board, proceeded to adopt new bylaws for Stedfast and appoint

---

[2]The minutes from this purported board meeting reflect that Mrs. Romero was the only board member present at the initial roll call. Robert Starnes was listed as "not present." Bookout, Gallagher, and Bo Ballard are listed as attendees.

4

themselves as officers.[3] On the same day that the meeting took place, Appellants filed a periodic report reflecting the purported changes in Stedfast's corporate leadership with the Texas Secretary of State.

Shortly thereafter, Appellants contacted Chase Bank to remove Shelley as the signatory on Stedfast's accounts and replace him with Bookout. Appellants then engaged an attorney to send a termination letter to Shelley purporting to remove him as Stedfast's pastor.[4]

After realizing that he no longer had access to Stedfast's bank accounts, discovering the periodic report filed by Appellants naming themselves as officers and directors of Stedfast, and receiving the termination letter, Shelley engaged legal counsel to represent Stedfast and himself. In early October 2021, Stedfast's counsel filed a Restated Certificate of Formation for the church naming Shelley, his wife Keri Shelley, and Ryan Urbanek as directors. In addition, at a meeting held October 3, 2021, this alternate slate of directors adopted new bylaws for Stedfast.

### B. Bookout's Vitriolic Statements about Shelley and Stedfast

In June 2019—approximately two years before the previously described battle for control of Stedfast began—Shelley confronted Bookout and admonished him for

---

[3]The minutes of the meeting reflect that the directors appointed Bookout as President, Mrs. Romero as Vice-President and Secretary, and Gallagher as Vice-President and Treasurer.

[4]Appellants apparently used funds from Stedfast's bank accounts at Chase Bank to pay for the retention of this attorney. The attorney's firm has since deposited all money it received from Stedfast's accounts into the trial court's registry.

5

"railing" and promoting false doctrines such as "Flat Earth Theory." When Bookout refused to repent, Shelley removed him as a member of Stedfast.

After his removal, Bookout began to harshly and publicly criticize both Shelley and Stedfast. Specifically, Shelley claims that in videos posted to social media platforms such as YouTube, Bookout accused him of, among other things, physically abusing his children, embezzling funds from Stedfast to pay for the remodeling of his home, and being a "sodomite." In addition, Shelley claims that Bookout described Stedfast as a cult and accused Shelley of being a cult leader.

## C.    Legal Proceedings

In October 2021, Shelley and Stedfast filed suit against Appellants seeking injunctive relief; damages for conversion and defamation; and a declaratory judgment that, among other things, Shelley, Keri Shelley, and Ryan Urbanek (sometimes collectively referred to herein as the Shelley Group)—not Appellants—are the duly elected and appointed members of Stedfast's board of directors. Appellants filed a motion to dismiss pursuant to the TCPA. The trial court denied the motion to dismiss and, finding that the motion was frivolous or filed for the sole purpose of delay, ordered Appellants to pay Stedfast's attorney's fees and expenses incurred in responding to the motion. This interlocutory appeal followed.[5]

---

[5]The Texas Civil Practice and Remedies Code provides for an interlocutory appeal of an order that "denies a motion to dismiss filed under" the TCPA. *Id.* § 51.014(a)(12).

# III. Analysis

On appeal, Appellants raise seven issues:

(1)     Whether the trial court has subject matter jurisdiction to decide the issues raised in Appellees' causes of action under the ecclesiastical abstention doctrine;

(2)     Whether the trial court erred in ruling that Appellees' causes of action were not based on Appellants' exercise of the freedom of speech, association, or petition;[6]

(3)     Whether the trial court erred when it denied Appellants' motion to dismiss Appellees' defamation cause of action against Appellants Romero and Gallagher;

(4)     Whether the trial court erred when it denied Appellants' motion to dismiss Appellees' defamation cause of action against Appellant Bookout;

(5)     Whether the trial court erred when it denied the motion to dismiss Appellees' conversion cause of action;

(6)     Whether the trial court erred when it denied the motion to dismiss Appellees' declaratory judgment cause of action; and

(7)     Whether the trial court erred in awarding attorney's fees and costs to Appellees based upon its finding that Appellants' motion to dismiss was frivolous or filed solely for the purposes of delay.

---

[6]It is unclear whether the trial court did, in fact, make this determination. The trial court's order contains no express ruling regarding whether Appellees' causes of action are based on Appellants' exercise of the freedom of speech, association, or petition, and the trial court did not issue specific findings of fact or conclusions of law. As we will further discuss below, Appellees concede that their defamation cause of action is based on Appellants' exercise of the freedom of speech; however, they dispute whether their declaratory judgment and conversion causes of action are sufficiently linked to Appellants' right of association to be brought under the auspices of the TCPA. In any event, as we must necessarily determine whether the TCPA applies to each of Appellees' claims in order to resolve Appellants' fourth, fifth, and sixth issues, we do not address this issue separately.

7

We will address each of these issues below.

### A. Subject Matter Jurisdiction: Application of the Ecclesiastical Abstention Doctrine

In their first issue, Appellants assert that the trial court does not have subject matter jurisdiction over Appellees' causes of action under the ecclesiastical abstention doctrine.[7] Because a determination that the trial court lacks subject matter jurisdiction would be dispositive of this appeal, we will address this issue first. *See Blum v. Restland of Dall., Inc.*, 971 S.W.2d 546, 549 (Tex. App.—Dallas 1997, pet. denied).

### 1. Subject Matter Jurisdiction and Standard of Review

"'Subject matter jurisdiction cannot be waived or conferred by agreement' and 'can be raised at any time,' including in an interlocutory appeal." *Anderson v. Truelove*, 446 S.W.3d 87, 91 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 103 (Tex. 2012) (Lehrmann, J., concurring in part and dissenting in part)). We review the existence of subject matter jurisdiction de novo.[8] *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The pleader must allege facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Dall. Cnty. Appraisal Dist. v. Funds Recovery, Inc.*, 887 S.W.2d 465, 469 (Tex. App.—Dallas 1994,

---

[7]As noted above, Appellants did not raise this issue in the trial court and assert it for the first time on appeal.

[8]Because, as noted above, Appellants raised this issue for the first time on appeal, it was not addressed in the trial court.

writ denied) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). When reviewing subject matter jurisdiction, we must construe the petition in favor of the pleader and, if necessary, review the entire record to determine if any evidence supports jurisdiction. *Id.* (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446); *see Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 804 (Tex. App.—Fort Worth 2008, no pet.).

### 2.     The Ecclesiastical Abstention Doctrine

The ecclesiastical abstention doctrine prohibits civil courts from delving into matters of theological controversy, church discipline, ecclesiastical government, or members' conformity to the church's moral standards. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14, 96 S. Ct. 2372, 2382 (1976) (quoting *Watson v. Jones*, 80 U.S. 733, 733–34 (1871)). The doctrine is grounded in the First Amendment, which protects the right of religious institutions to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine. *Id.* at 721–22, 96 S. Ct. at 2386; *In re Diocese of Lubbock*, 624 S.W.3d 506, 508–09 (Tex. 2021) (orig. proceeding).

"Determining the reach of subject matter jurisdiction in disputes involving religious organizations requires consideration of competing demands." *Thiagarajan v. Tadepalli*, 430 S.W.3d 589, 594 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate

9

ecclesiastical decision makers." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 605–06 (Tex. 2013). "But Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists." *Id.* at 606. "In short, courts must act but cannot intrude." *Thiagarajan*, 430 S.W.3d at 595; *see also Masterson*, 422 S.W.3d at 596 (recognizing that Texas courts have a "constitutional duty to decide disputes within their jurisdiction while still respecting limitations the First Amendment places on that jurisdiction").

"Properly exercising jurisdiction requires courts to apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues." *Masterson*, 422 S.W.3d at 606. "Thus, courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved." *Id.* "[T]he line between required judicial action and forbidden judicial intrusion 'will not always be distinct' because many disputes 'require courts to analyze church documents and organizational structures to some degree.'" *Thiagarajan*, 430 S.W.3d at 595 (quoting *Masterson*, 422 S.W.3d at 606). "[C]ourts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata." *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ) (citing *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, writ denied)); *see also Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Whether this

10

suit is ecclesiastical, or concerns property rights, torts, or criminal conduct, is determined by first examining the substance and effect of the [plaintiffs'] petition—without considering what they use as claims—to determine its ecclesiastical implication.").

### 3. Application to the Present Case

To determine whether and to what extent the ecclesiastical abstention doctrine applies to the present case, we must examine the "substance and effect" of Appellees' petition to evaluate its ecclesiastical implication. *See Tran*, 934 S.W.2d at 743. In their amended original petition, Appellees assert causes of action for defamation, declaratory relief, and conversion. We will consider the applicability of the ecclesiastical abstention doctrine to each of these causes of action in turn.

#### a. Defamation

To prevail on a cause of action for defamation, "[a] plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). In addition, unless the statement in question constitutes defamation per se, the plaintiff must prove damages. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 146 n.7 (Tex. 2014). "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community

11

or to deter third persons from associating or dealing with him, or if it tends to expose him to public hatred, contempt, or ridicule." *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 92 (Tex. App.—Dallas 1996, writ denied) (citing *Hardwick v. Hous. Lighting & Power Co.*, 881 S.W.2d 195, 197 (Tex. App.—Corpus Christi–Edinburg 1994, writ dism'd w.o.j.)).

Appellees' defamation claims are primarily based upon certain statements allegedly made by Bookout in videos posted to social media in which he, among other things, called Shelley a "sodomite" and accused him of physically abusing his children and embezzling money from Stedfast to pay for a home remodel. Bookout also allegedly referred to Shelley as a "cult leader" and claimed Stedfast was a "cult." In addition, Appellees' petition asserts—without specifics—that the termination letter Appellants' counsel sent to Shelley contained "several false and defamatory statements about the character of Pastor Shelley." We will consider each of these statements in turn to determine whether the ecclesiastical abstention doctrine deprives the trial court of jurisdiction to hear claims predicated on the statements.

First, Bookout's alleged accusations that Shelley had physically abused his children and embezzled money from Stedfast clearly have no ecclesiastical implications. The truth or falsity of these allegations does not depend on any church doctrine or turn on anyone's religious beliefs. Moreover, the defamatory nature of these allegations is not inextricably intertwined with ecclesiastical matters because, while such behavior would run counter to the teachings of most churches or religious

12

institutions, it is also against the law and can be viewed as defamatory from a purely secular standpoint. Indeed, if—as Appellees assert—these statements unambiguously and falsely impute criminal conduct to Shelley, they would constitute defamation per se, meaning damages would be presumed. *See Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christ–Edinburg 1997, writ denied). Thus, these allegations are not unlike those routinely considered by courts in adjudicating defamation claims involving secular parties. Therefore, we conclude that these statements are actionable—no matter the ecclesiastical abstention doctrine.

Bookout's statements that Shelley was a "cult leader" and that Stedfast was a "cult" fall on the other end of the spectrum. As one of our sister courts has recognized, "being labeled a 'cult' is not actionable because the truth or falsity of the statement depends upon one's religious beliefs, an ecclesiastical matter which cannot and should not be tried in a court of law." *Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 212 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Sands v. Living Word Fellowship*, 34 P.3d 955, 960 (Alaska 2001)). Thus, the ecclesiastical abstention doctrine bars any defamation claim arising from these statements.

Next, we must consider Bookout's statement that Shelley is a "sodomite." The applicability of the ecclesiastical abstention doctrine to this statement is not as clear-cut. "Sodomite" is not a strictly religious label and can be defined in purely secular

terms.[9] However, an examination of Shelley's reasons for asserting that this and other similar statements by Bookout are offensive reveals that the claim is religious in nature.[10] Shelley asserts that these statements constitute defamation per se because they bear on his "fitness and qualifications to serve as a [p]astor not only at Stedfast Baptist Church, but anywhere." Thus, the adjudication of this claim would require the court to examine church doctrines, the qualifications to serve as a pastor not only at Stedfast but in other churches, and Shelley's conformity to standards of morality, all of which are prohibited under the ecclesiastical abstention doctrine. *See Becker v. Clardy*, No. 03-10-00376-CV, 2011 WL 6756999, at *4 (Tex. App.—Austin Dec. 22, 2011, pet. denied) (mem. op.) (holding the ecclesiastical abstention doctrine applied to a defamation claim where the determination as to "[w]hether or not to 'impose civil tort liability' against [the defendant] . . . would require an analysis of internal church matters and doctrine"); *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.) (recognizing that "[i]t is without dispute that the First Amendment

---

[9]Indeed, Black's Law Dictionary contains a definition of the term "sodomy," of which "sodomite" is a derivation. *Sodomy*, Black's Law Dictionary (11th ed. 2019).

[10]Shelley alleges that, in addition to calling him a "sodomite," Bookout posted a video of a coffee mug with Shelley's image and a rainbow flag engraved on it, which Bookout stated was part of "the Official Pastor Jonathan Shelley Merchandise" that Shelley had made himself. According to Shelley, Bookout also claimed that Shelley wore nail polish and had worn lipstick in his high school yearbook photo. Shelley asserts that these statements are defamatory because "they suggest that [he] engage[s] in sexual activities that are condemned by the doctrines of [his] [c]hurch." Accordingly, our ruling regarding the actionability of Bookout's statement that Shelley was a "sodomite" applies with equal force to these statements.

14

prohibits civil courts from intruding into the church's governance of 'religious' or 'ecclesiastical' matters, such as . . . the conformity of members to standards of morality"); *cf. HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 642–43 (Tex. 2007) ("Since the government cannot determine what a church should be, it cannot determine the qualifications a cleric should have or whether a particular person has them." (footnote omitted)); *In re First Christian Methodist Evangelistic Church*, No. 05-18-01533-CV, 2019 WL 4126604, at *5 (Tex. App.—Dallas Aug. 30, 2019, orig. proceeding) (mem. op.) (granting mandamus relief in suit based on dismissal of senior pastor because ecclesiastical abstention doctrine prohibited court from examining church's teachings and rules or reasons for termination). Accordingly, the ecclesiastical abstention doctrine bars any claim for defamation based on Bookout's statement that Shelley is a "sodomite."

Finally, we consider the allegedly defamatory statements contained in the termination letter sent to Shelley.[11] While Appellees' petition does not identify any

---

[11]It is unclear whether Appellees, in fact, assert a defamation claim based upon the statements contained in the termination letter, and it is also unclear whether such statements were "published." *See WFAA–TV*, 978 S.W.2d at 571 (listing publication among the elements of a defamation claim). Appellees' amended petition states that the correspondence "contains several false and defamatory statements about the character of Pastor Shelley" and that a copy of the correspondence is attached thereto "for the purpose of demonstrating the nature of the defamatory conduct that has been committed by Defendants." However, in their briefing before this court, Appellees assert that their defamation cause of action was directed solely against Bookout and, thus, presumably based only on his previously addressed statements. Given the uncertainty, we address the actionability of the statements contained in the termination letter in the interests of completeness and caution. *See Carr v. Jaffe Aircraft*

15

specific statements in the letter as defamatory, our examination of the letter, which mostly contains directives commanding Shelley to turn over various property and to refrain from engaging in certain activities on behalf of Stedfast, revealed only one sentence explaining the reason for Shelley's termination: "This termination was determined to be for cause due to many irregularities in the accounting, management and handling of donations to the church." Arguably, this statement implies that Shelley mismanaged church funds. To the extent Appellees assert a claim for defamation based upon this statement, such a claim is not barred by the ecclesiastical abstention doctrine. Rather, because the truth or falsity of this statement can be determined by reviewing the church's books and records and applying neutral principles of law, it is actionable. *Cf. Lacy v. Bassett*, 132 S.W.3d 119, 125–26 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding inspection of church books and records under former Texas Revised Civil Statute Article 1396–2.23 did not implicate ecclesiastical abstention doctrine).

### b. Declaratory Relief

Chapter 37 of the Texas Civil Practice & Remedies Code provides that

[a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise

*Corp.*, 884 S.W.2d 797, 803 (Tex. App.—San Antonio 1994, no writ); *Jones v. State*, No. C14-92-01182-CR, 1993 WL 153660, at *3 (Tex. App.—Houston [14th Dist.] May 13, 1993, pet. ref'd) (not designated for publication).

and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). "Chapter 37's stated purpose is 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 271 (Tex. 2021) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 37.002(b)).

In their amended petition, Appellees seek a declaratory judgment that:

(a)     Stedfast Baptist Church is a Texas nonprofit corporation engaged in performing religious training, education, and exhortation activities and is governed by a board of directors of which, pursuant to the bylaws of the corporation, the pastor of the congregation is a member;

(b)     Stedfast Baptist Church is an independent, congregational, non-hierarchical religious organization whose members are communicants in good standing and is governed by a board of directors elected and appointed pursuant to the bylaws of the corporation;

(c)     Jonathan Shelley is the duly appointed and ordained pastor of Stedfast;

(d)     The members of the Shelley Group are the duly elected and appointed members of the board of directors of Stedfast;

(e)     Appellants are not the duly elected and appointed members of the board of directors of Stedfast, and none of them has any authority whatever to act on behalf of or bind Stedfast;

17

(f)     The documents filed by Appellants are false and fraudulent, and Appellants filed such documents with the Secretary of State knowingly, intentionally, and fraudulently; and

(g)     As the duly elected and designated members of the board of directors of Stedfast, the Shelley Group, or its designated representative, is entitled to access to all bank accounts at Chase Bank held in Stedfast's name.

Thus, at the heart of Appellees' request for declaratory relief is whether the Shelley Group or Appellants are the duly elected and appointed members of Stedfast's board of directors.

Applying the ecclesiastical abstention doctrine to Appellees' request for declaratory relief highlights the indistinct nature of "the line between required judicial action and forbidden judicial intrusion." *Thiagarajan*, 430 S.W.3d at 595. On one hand, adjudication of this cause of action will require the examination of church documents and organizational structures, and given the nature of the declaratory relief sought, the outcome of this cause of action will, in essence, decide who has authority to manage and act on behalf of Stedfast. This, at first blush, might lead one to conclude that it would be barred as an improper intrusion into matters of ecclesiastical government. *See, e.g.*, *In re Diocese of Lubbock*, 624 S.W.3d at 508–09. However, because the resolution of this cause of action does not turn on matters of an ecclesiastical or inherently religious nature but, rather, hinges on the interpretation and verification of corporate documents—including Stedfast's bylaws and board

18

minutes—and the Texas Business Organizations Code, the trial court may properly exercise jurisdiction. *See Ceglar v. Christ's Harbor Church*, No. 13-19-00034-CV, 2020 WL 948380, at *2 (Tex. App.—Corpus Christi–Edinburg, Feb. 27, 2020, pet. denied) (mem. op.) ("Under [a neutral principles of law] approach, a court may interpret church documents in purely secular terms without relying on religious precepts in resolving the conflict."); *Lacy*, 132 S.W.3d at 123 (same).

An examination of the specific declaratory relief sought by Appellees reveals that this cause of action is, at its core, a dispute over corporate governance, not religious or doctrinal matters. *See Iglesia Pentecostal Filadelfia, Inc. v. Rodriguez*, No. 13-20-00012-CV, 2021 WL 6129316, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2021, no pet.) (mem. op.) ("A court may exercise jurisdiction over a [controversy] if it can apply neutral principles of law that will not require inquiry into matters such as religious doctrine." (first citing *Westbrook v. Penley*, 231 S.W.3d 389, 398–400 (Tex. 2007); then citing *Dean*, 994 S.W.2d at 395; and then citing *Ceglar*, 2020 WL 948380, at *2)).

The relief sought in items (a) and (b) on the list of Appellees' requested declaratory relief pertains to Stedfast's basic organizational structure and purpose, which can be readily determined by reviewing its articles of incorporation and bylaws. The adjudication of the remaining items, (c) through (g), depends—at least primarily—upon the determination of whether the Shelley Group or Appellants are the rightful directors of Stedfast. Appellees have presented evidence in the form of

19

corporate records, including board minutes, and affidavits to support their claim that the Shelley Group is the rightful board of directors. Appellants have challenged this evidence, specifically with respect to whether Leslye Romero signed the minutes from the January 2019 board meeting reflecting that she and the other then-current board members had been removed and replaced by Shelley, Edelmann, and Urbanek. Thus, the resolution of this central issue will involve examining and verifying corporate records and organizational documents and evaluating the credibility of witness testimony regarding corporate actions, all of which can be done on a purely secular basis by applying neutral principles of law. *Cf. Masterson*, 422 S.W.3d at 608 (holding dispute could be resolved by application of neutral principles of law where bylaws expressly governed the question presented). Crucially, its adjudication will not require the court to examine or resolve any questions touching upon matters of faith, doctrine, or church discipline.

Among the cases Appellants cite in support of their contention that the trial court lacks jurisdiction is our prior opinion in *Dean*. 994 S.W.2d at 394–95. However, *Dean* is distinguishable from the present case.[12] In *Dean*, a church had conducted two

---

[12]Moreover, we recognize, as one of our sister courts in Houston has pointed out, that *Dean* was decided 15 years before *Masterson*, in which the Texas Supreme Court "reaffirmed that courts should defer to 'religious entities' decisions on ecclesiastical and church polity questions,' but held that 'courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved.'" *Anderson*, 446 S.W.3d at 93 (citing *Masterson*, 422 S.W.3d at 596, 606). Now, after *Masterson*, it is unclear whether courts may consider the propriety of a minister's termination—an

20

congregational elections to decide whether to retain their pastor. *Id.* at 394. In the first election, the church voted to retain the pastor, but because the election had been marred by physical altercations, some congregants considered the vote tainted and filed suit for injunctive relief. *Id.* A second election was held in which the church members voted 87 to 1 to remove the pastor, and the plaintiffs amended their petition to seek declaratory relief regarding his removal. *Id.* Recognizing that "[t]he relationships between an organized church and its ministers [are] its lifeblood," we held that "the issue of a pastor's ouster is ecclesiastical in nature" and that, therefore, abstention was required. *Id.* at 395.

The present case is distinguishable because while *Dean* was principally concerned with the termination of a pastor, the issue of Shelley's termination is not directly at issue. Indeed, Appellees' petition contains no allegation that Shelley was discharged, much less wrongfully discharged. While Appellees seek a declaratory judgment that "Shelley is the duly appointed and ordained [p]astor of Stedfast," this determination turns on the antecedent issue of whether Appellants or the Shelley Group is Stedfast's true board of directors. If, as Appellees claim, Appellants are not the duly elected members of Stedfast's board, then the termination letter that they caused to be sent to Shelley would be of no force or effect, and since Shelley's original

---

issue previously believed to be unreviewable—"in cases in which the question turns on the substance of a document to which neutral principles of law may be applied, such as an incorporated church's bylaws." *Id.* In any event, because Shelley's termination is not directly at issue in this case, we need not decide this question here.

21

appointment as Stedfast's pastor in 2019 is not in dispute, he would therefore continue to be "the duly appointed and ordained [p]astor of Stedfast." Thus, unlike in *Dean*, the trial court will not be required to involve itself in the inherently ecclesiastical process of determining whether the church members desire to sever their relationship with their pastor; rather, the court will only be required to resolve the antecedent issue of corporate governance, which, as noted above, can be accomplished by applying neutral principles of law to review and verify Stedfast's organizational documents and corporate records, including board minutes. *Cf. Masterson*, 422 S.W.3d at 608.

The *Anderson* case, which Appellants also cite in support of their argument for ecclesiastical abstention, is likewise distinguishable. 446 S.W.3d at 91. As Appellants point out in their briefing, *Anderson*'s facts are, in many respects, "eerily reminiscent" of the present case: both involve the attempted ouster of a pastor of a non-hierarchical church incorporated as a nonprofit under the laws of Texas by a board of directors with disputed membership. *Id.* at 89–90. However, there are two significant differences. First, unlike the present case, in *Anderson*, the pastor's termination was directly at issue as the pastor sought declaratory relief that his termination was void— relief not sought by Appellees here. *Id.* Second, and more importantly, the pastor in *Anderson* had argued and presented evidence showing that the church's bylaws did not permit the board of directors to terminate him. *Id.* at 90. As one witness testified, "whether [the pastor] stays or goes is something for the church members to decide." *Id.* This lack of board authority was central to the *Anderson* court's ruling, as it held

22

that because the bylaws contained no provision regarding the termination of a minister, the court could not "merely construe the bylaws under neutral principles of law to resolve the parties' dispute." *Id.* at 94. Here, no such challenge to the board's authority has been raised. While Appellees seek declaratory relief that Appellants are not duly elected members of Stedfast's board, they do not question whether a properly elected board would have the authority to terminate Shelley.[13] Thus, unlike *Anderson*, the controlling issue is not the board's authority to terminate a pastor but, rather, which slate of board members—Appellants or the Shelley Group—is the rightful one. As this issue can be decided by applying neutral principles of law to

---

[13]Appellants point out in their briefing that, while Appellees have produced the bylaws that were prepared and filed by their counsel on October 4, 2021, they have not yet produced the bylaws that were in effect during the period of January 2019 to September 2021. In an attempt to align the issues presented in the present case with those presented in *Anderson*, Appellants assert that because the bylaws presented by Appellees are similarly silent regarding the board's authority to terminate a pastor and the prior bylaws are not part of the appellate record, the court "has no method of applying neutral principles of . . . law to the firing of Jonathan Shelley." However, as noted above, the board's termination of Shelley is not directly at issue in this case, nor have Appellees challenged the authority of a duly elected board to terminate a pastor. Even if the propriety of Shelley's termination were directly at issue, given that Appellants clearly believed that they had authority to terminate Shelley at the time the termination letter was sent, it would—at a minimum—be awkward for them to now take the position that they did not have the authority to terminate him. Indeed, as Appellants have asserted a counterclaim against Shelley for fraud based on their assertion that he "is fraudulently holding himself out as the pastor of the church when he has been terminated," it would appear that they have already judicially admitted that the board has the authority to terminate a pastor. *See TX Far W., Ltd. v. Tex. Invs. Mgmt., Inc.*, 127 S.W.3d 295, 307 (Tex. App.—Austin 2004, no pet.) ("It is well established that 'assertions of fact . . . in the live pleadings of a party are regarded as formal judicial admissions.'" (quoting *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001))).

23

construe and verify Stedfast's organizational documents and corporate records, the trial court may properly exercise jurisdiction.

In sum, because the court can adjudicate Appellees' request for declaratory relief by applying neutral principles of law to review and verify Stedfast's organizational documents and corporate records, including board minutes, the trial court may properly exercise jurisdiction over this cause of action. *See Masterson*, 422 S.W.3d at 606; *cf. Lee v. Paik*, No. 05-17-01406-CV, 2019 WL 1033869, at *1–3 (Tex. App.—Dallas Mar. 5, 2019, no pet.) (mem. op.) (affirming declaratory judgment regarding, *inter alia*, the composition of the board of trustees of a church incorporated as a nonprofit corporation under the Texas Business Organizations Code and the termination of the church's pastor that contained the trial court's specific finding that "the Court need not (and did not) refer to any ecclesiastical law or theological doctrine in making its determination in this case").

### c. Conversion

Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997). "To establish conversion of personal property, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; and (3) the

24

plaintiff suffered injury." *Lopez v. Lopez*, 271 S.W.3d 780, 784 (Tex. App.—Waco 2008, no pet.) (op. on reh'g) (first citing *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997); and then citing *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, pet. denied) (op. on reh'g)).

Appellees' conversion claim is based on Appellants' actions to assume control of Stedfast's bank accounts, which contained approximately $125,000 in deposits, and to pay $40,000 of those funds to Appellants' counsel. Thus, Appellees' conversion claim—like most of their requests for declaratory relief—turns on the issue of which slate of board members—Appellants or the Shelley Group—is the rightful one. For if Appellants are the duly elected members of Stedfast's board, then their exercise of dominion and control over Stedfast's bank accounts would be neither unlawful nor unauthorized. Since Appellees' conversion and declaratory judgment causes of action revolve around the same central issue, our ecclesiastical abstention analysis is the same: because the court can resolve the dispute regarding the membership of Stedfast's board by applying neutral principles of law to review and verify Stedfast's organizational documents and corporate records, including board minutes, the trial court may properly exercise jurisdiction. *See Masterson*, 422 S.W.3d at 606. Indeed, a conversion claim is, at its core, a property dispute, which the Texas Supreme Court has expressly declared to be a matter courts can decide using the neutral-principles methodology. *See In re Diocese of Lubbock*, 624 S.W.3d at 513 ("Under the neutral-principles methodology, 'courts decide non-ecclesiastical issues such as property

ownership based on the same neutral principles of law applicable to other entities . . . .'" (quoting *Masterson*, 422 S.W.3d at 596)).

### d. Summary

Having applied the ecclesiastical abstention doctrine to Appellees' causes of action, we sustain in part and overrule in part Appellants' first issue. We conclude that under the ecclesiastical abstention doctrine the trial court lacks subject matter jurisdiction over Appellees' defamation claim to the extent that it is based on Bookout's alleged statements that Stedfast is a "cult" and that Shelley is a "cult leader." Similarly, Bookout's alleged statements referring to Shelley as a "sodomite" or "suggest[ing] that [Shelley] engage[s] in sexual activities that are condemned by the doctrines of [his] [c]hurch" are not actionable. However, the trial court may properly exercise jurisdiction over the remainder of Appellees' defamation claim as well as their causes of action for declaratory relief and conversion.

### B. The Texas Citizens Participation Act (TCPA)

Having determined that, though the ecclesiastical abstention doctrine prohibits Appellees from relying on certain statements to support their defamation claim, the trial court may nevertheless properly exercise subject matter jurisdiction over all of Appellees' causes of action, we must now consider whether any of these claims must be dismissed under the TCPA.

### 1.  Standard of Review

We review de novo a trial court's denial of a TCPA motion to dismiss.  *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 603 (Tex. App.—San Antonio 2018, pet. denied).  In reviewing a ruling on a TCPA motion, "[w]e view the pleadings and evidence in the light most favorable to the nonmovant."  *Id.*

We also review questions of statutory construction de novo.  *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017); *see also Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018) ("In TCPA appeals, we have decided whether communications are matters of public concern under a *de novo* standard of review, suggesting that the determination is one of law.").  Our objective is to "ascertain and give effect to the Legislature's intent as expressed by the language of the statute."  *State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018) (quoting *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008)).  When a statute does not define a key term, we give that term its "common, ordinary meaning unless a contrary meaning is apparent from the statute's language."  *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017).  To determine a word's common, ordinary meaning, we look first to its dictionary definitions.  *Id.* at 35.  "[I]f an undefined term has multiple common meanings . . . we will apply the definition most consistent with the context of the statutory scheme."  *Thompson v. Tex. Dep't of Licensing & Regul.*, 455 S.W.3d 569, 571 (Tex. 2014).

In addition to these general rules of statutory construction, we must adhere to the express directions for construction contained within the TCPA itself. *See State ex rel. Best*, 562 S.W.3d at 11. Thus, we construe the TCPA "liberally to effectuate its purpose and intent fully." Tex. Civ. Prac. & Rem. Code Ann. § 27.011(b).

## 2. The Background and Structure of the TCPA

The TCPA is popularly known as the Texas Anti-SLAPP statute, referring to Strategic Lawsuits Against Public Participation. Its stated purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002. To effectuate this purpose, the TCPA provides "an expedited procedure for the early dismissal of groundless legal actions that impinge on First Amendment rights." *Greer v. Abraham*, 489 S.W.3d 440, 442 (Tex. 2016).

This court has previously described the three-part burden-shifting analysis that must be undertaken once a motion to dismiss is filed under the TCPA:

> The three steps are as follows: (1) the party invoking the TCPA must demonstrate that a "legal action" has been brought against it that is "based on or is in response to" an exercise of the rights of free speech, petition, or association protected by the Act; (2) if the moving party successfully invokes the Act, "[t]he court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question[;]" and (3) if the nonmoving party carries its burden, the case may still be dismissed "if the moving party establishes

28

an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." [Tex. Civ. Prac. & Rem. Code Ann.] § 27.005(b)–(d).

*Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at *7 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.).

### 3. Application to the Present Case

Appellants moved to dismiss all of Appellees' claims under the TCPA, asserting that Appellees' defamation cause of action is based on Appellants' right of free speech and that Appellees' declaratory judgment and conversion causes of action are based on Appellants' right of association. While Appellees concede that their defamation claim falls within the scope of the TCPA, they contend that the Act does not apply to their causes of action for declaratory judgment and conversion. Thus, though we will need to determine whether Appellants have satisfied their burden to show that Appellees' declaratory judgment and conversion claims are "based on or in response to" Appellants' rights of association, we can dispense with this first step of the TCPA burden-shifting analysis with respect to Appellees' defamation cause of action.

### a. Defamation: Claims against Gallagher and Romero

In their third issue, Appellants assert that the trial court erred when it denied Appellants' motion to dismiss Appellees' defamation cause of action against Gallagher and Romero. In their brief, Appellees claim that their defamation cause of action was directed solely at Bookout and that they do not assert a defamation claim against Gallagher or Romero. Appellants—not satisfied with what they label Appellees'

29

"unorthodox nonsuit" because it would deny them the possibility of an award of attorney's fees or sanctions that comes with dismissal under the TCPA—request that any defamation claims against Gallagher and Romero be dismissed. Thus, before we turn our focus to whether Appellees have carried their burden under the TCPA to present clear and specific evidence to establish a prima facie case of defamation against Bookout, we must first consider whether the trial court erred by failing to dismiss Appellees' supposed defamation claims against Gallagher and Romero.

Appellants assert that, notwithstanding Appellees' recent protestations to the contrary, Appellees' amended petition put Gallagher and Romero on notice that they would have to defend against a defamation suit. Appellants base this assertion on the following allegation contained in the "Factual Background" section of Appellees' amended petition:

> Defendants retained Counsel to deliver to Jonathan Shelley a letter . . . . The correspondence . . . contains several false and defamatory statements about the character of Pastor Shelley. A true and correct copy of the correspondence is attached hereto as Exhibit A for the purpose of demonstrating the nature of *the defamatory conduct that has been committed by Defendants*. [Emphasis added.]

For their part, Appellees contend that their petition never specified a cause of action for defamation against either Gallagher or Romero. This contention is based on the wording used to assert their defamation cause of action, which provides, in relevant part, that "Plaintiff would show that *Defendants, one or all of them*, intentionally and knowingly published false and defamatory statements about Plaintiff Jonathan

30

Shelley, Plaintiff Stedfast[,] and others." [Emphasis added.] Appellees assert that because the phrase "Defendants, one or all of them" could refer to fewer than all Appellants and because the petition's factual allegations and the arguments in Appellees' response to the motion to dismiss made it clear that their defamation cause of action was directed solely at Bookout, the trial court had no basis for dismissing a nonexistent defamation claim against Gallagher or Romero.

Appellees argue that we should liberally construe their petition in their favor and look to their intent in deciding this issue. Given that the situation presented here is analogous to that presented by a motion to dismiss under Rule 91a of the Texas Rules of Civil Procedure,[14] Appellees' argument has merit. *See Drake v. Walker*, No. 05-14-00355-CV, 2015 WL 2160565, at *3 (Tex. App.—Dallas May 8, 2015, no pet.) (mem. op.) (holding that "when reviewing a [Rule] 91a motion to dismiss alleging that a party's claims have no basis in law" the court construes "the pleadings liberally in favor of the plaintiff, looking to the pleader's intent"); *Wooley v. Schaffer*, 447 S.W.3d 71, 76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("In conducting our

---

[14]Rule 91a provides, in pertinent part, as follows:

> [A] party may move to dismiss a cause of action on the grounds that it has no basis in law or fact. A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought. A cause of action has no basis in fact if no reasonable person could believe the facts pleaded.

Tex. R. Civ. P. 91a.1.

31

review [of a Rule 91a motion to dismiss], . . . we must construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings to determine if the cause of action has a basis in law or fact."). However, we note the oddity that it is the plaintiffs who are requesting that their petition be "liberally construed" as *not* asserting a cause of action against certain parties. This somewhat unusual posture turns the traditional concept of the liberal construction of the plaintiff's pleadings on its head.

Because Appellants' request for dismissal of the supposed defamation claims against Gallagher and Romero was procedurally defective, we need not decide whether to accept Appellees' view of "liberal construction." In their motion to dismiss, Appellants did not request that Appellees' supposed defamation claims against Gallagher and Romero be dismissed on the grounds that they lack a basis in law.[15] Rather, Appellants raised this issue for the first time in a single sentence in the "Conclusion" of their reply to Appellees' response to their motion to dismiss in which they stated that "the Plaintiffs have not referred to any instances of defamation as to either Ryan Gallagher or Leslye Romero at all." While we are not aware of any cases addressing whether a trial court may properly consider an argument raised for the first

---

[15]The closest Appellants came to making such a request was their inclusion of language in their prayer requesting that the trial court "finally dismiss[] all of Plaintiffs' claims, or a portion of them as applicable." However, this language is far too vague to be construed as a request for the dismissal of Appellees' supposed defamation causes of action against Gallagher and Romero on the grounds that they have no basis in law.

time in a reply brief in support of a motion to dismiss under the TCPA, in the analogous context of a no-evidence motion for summary judgment,[16] it is well settled that courts cannot consider arguments raised for the first time in a reply brief. *LaRue v. Chief Oil & Gas, L.L.C.*, 167 S.W.3d 866, 876 (Tex. App.—Fort Worth 2005, no pet.) (holding that "a reply to a response to a no-evidence motion for summary judgment may not contain a new no-evidence issue"); *see also Wyly v. Integrity Ins. Sols.*, 502 S.W.3d 901, 907 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Because these grounds were not raised in the motion for summary judgment, [the defendant] could not raise them for the first time in its reply." (citing *Reliance Ins. Co. v. Hibdon*, 333 S.W.3d 364, 378 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (op. on reh'g))); *Mei-Chiao Chen Wu v. City of San Antonio*, No. 04-10-00836-CV, 2013 WL 4084721, at *5 (Tex. App.—San Antonio Aug. 14, 2013, pet. denied) (mem. op. on reh'g) ("[A]llowing arguments made in the movant's reply to be considered, after the fact, as independent grounds for summary judgment would subvert the orderly process contemplated by rule 166a and put the nonmovant to an unfair burden." (quoting *Sanders v. Capitol Area Council*, 930 S.W.2d 905, 911 (Tex. App.—Austin 1996, no writ) (op. on reh'g))). Because Appellants did not specifically request in their motion that the trial court dismiss the supposed defamation claims against Gallagher and Romero

---

[16]In support of our view that these contexts are analogous, we note that the TCPA specifically provides that in determining whether a legal action should be dismissed thereunder, the court may consider the same evidence as it would in deciding a summary judgment motion filed under Rule 166a. Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a).

on the grounds that they have no basis in law and, instead, raised this issue for the first time in their reply, we hold that the trial court did not err in declining to grant this relief.

Moreover, we question whether a motion to dismiss under the TCPA would have been the proper vehicle by which to seek the relief requested by Appellants. As stated above, a party invoking the TCPA must demonstrate that a "legal action" has been brought against it that is "based on or is in response to" an exercise of the rights of free speech, petition, or association protected by the Act. Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a). Where, as here, a defendant seeks dismissal of a defamation claim on the grounds that the plaintiff's petition contains no allegations that the defendant made any defamatory statements, it is difficult to see how the defendant could show that the legal action was based on his exercise of free speech. In such an instance, the plaintiff has not alleged that any statements made by the defendant were defamatory, nor can the defendant point to any specific "speech" upon which the legal action is based. Thus, it would appear that the defendant could not properly invoke the TCPA. However, such a defendant is not without remedies. If, given the ambiguity in Appellees' petition, Gallagher and Romero were unsure as to whether they would be required to defend against a defamation suit, they could have filed special exceptions under Rule 91 or filed a motion to dismiss under Rule 91a on the grounds that the defamation claims against them had no basis in law. Tex. R. Civ. P. 91, 91a.1.

In sum, because Appellants did not specifically request the dismissal of the defamation claims against Gallagher and Romero on the grounds that they lack a basis in law in their TCPA motion to dismiss—or in a separate motion to dismiss under Rule 91a—the trial court did not err in declining to grant this relief.

We overrule Appellants' third issue.

### b. Defamation Step Two: Appellees' Prima Facie Case against Bookout

In their fourth issue, Appellants assert that the trial court erred by denying their motion to dismiss Appellees' defamation cause of action against Bookout. Because Appellees concede that the TCPA applies to their defamation cause of action, we begin our TCPA analysis with the question of whether Appellees carried their burden under the second step to present clear and specific evidence to establish a prima facie case of defamation against Bookout. We conclude that they did.

### (i) Our analysis of the evidence of Appellees' prima facie case will be governed by the following principles.

As we have previously recognized, a specialized body of law has emerged to define the prima facie burden a party responding to a TCPA motion to dismiss bears, to define the words used by the Act, and to explain the Act's concepts of proof. *Miller*, 2021 WL 924843, at *8. The salient governing principles are as follows:

- To present "clear and specific" evidence, the nonmovant "must provide enough detail to show the factual basis for its claim" and must provide enough evidence "to support a rational inference that the allegation of

35

fact is true." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019).

- The words "clear and specific" are defined to mean, for the former, "'unambiguous,' 'sure,' or 'free from doubt'" and, for the latter, "'explicit' or 'relating to a particular named thing.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding) (quoting *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)).

- "The [party responding to a TCPA motion to dismiss] may rely on circumstantial evidence—indirect evidence that creates an inference to establish a central fact—unless 'the connection between the fact and the inference is too weak to be of help in deciding the case.'" *Dall. Morning News*, 579 S.W.3d at 377 (quoting *Lipsky*, 460 S.W.3d at 589).

- The nonmovant surmounts its burden of establishing a prima facie case when the evidence presented is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. Stated differently, the burden is met by "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)).

- Statements that are conclusory or evidence that is speculative is not sufficient to carry the nonmovant's burden. *Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *9 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (en banc mem. op. on reh'g).

### (ii) There are four elements of defamation.

"Defamation's elements include: (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Lipsky*, 460 S.W.3d at 593 (first citing *WFAA–TV*, 978 S.W.2d at 571; and then citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 146 n.7). As noted above, "[a] statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him, or if it tends to expose him to public hatred, contempt, or ridicule." *Hanssen*, 938 S.W.2d at 92 (citing *Hardwick*, 881 S.W.2d at 197).

The "requisite degree of fault" depends on whether the person defamed is a private individual or a public figure. *Lipsky*, 460 S.W.3d at 593. "A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *Id.* (citing *WFAA–TV*, 978 S.W.2d at 571). In the context of a defamation claim, "actual malice" means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Id.* (citing *Huckabee v. Time Warner Ent. Co.*, 19 S.W.3d 413, 420 (Tex. 2000)).

37

Finally, with respect to damages, they must be pleaded and proven unless the statements at issue are defamatory per se. *Id.* (citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 146 n.7). For a statement to be defamatory per se, it must fall within one of four categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct. *Gray*, 941 S.W.2d at 329.

> **(iii) In reviewing whether Appellees established a prima facie claim for defamation, we do not require prima facie proof that every statement allegedly made by Appellants was defamatory.**

As we recently clarified, we are not required to determine that every statement that Bookout made is defamatory in order to conclude that Appellees carried their burden to prove that they have a viable cause of action for defamation. *Miller*, 2021 WL 924843, at \*9 (citing *Stone v. Melillo*, No. 14-18-00971-CV, 2020 WL 6143126, at \*5 (Tex. App.—Houston [14th Dist.] Oct. 20, 2020, no pet.) (mem. op.)). Instead, the inquiry is whether Appellees presented sufficient proof to establish a viable defamation cause of action, and that task requires only that we determine whether *any* of the statements made by Bookout were defamatory.[17] As we, quoting one of our sister courts, explained in *Miller*:

> While the TCPA requires that each legal claim be analyzed individually, the TCPA does not require that each factual basis or theory of recovery

---

[17]This is in contrast to our analysis of whether the trial court could properly exercise jurisdiction over Appellees' defamation cause of action, which was, by necessity, statement-specific. *See supra* Section III.A.3.a.

underpinning a cause of action must be analyzed separately. Tex. Civ. Prac. & Rem. Code [Ann.] § 27.005(c). Here, Appellees have a single defamation cause of action, which is based upon statements made by [Appellant] . . . . If Appellees are successful in presenting prima facie proof in support of their defamation claim as to any of the statements . . . , then Appellees will have met their burden under the second step. *See Thang Bui*[ *v. Dangelas*, No. 01-18-01146-CV], 2019 WL 5151410, at *5 [(Tex. App.—Houston [1st Dist.] Oct. 15, 2019, pet. denied) (mem. op.)]; *see generally Landry's, Inc.*[ *v. Animal Legal Def. Fund*], 566 S.W.3d [41,] 53–57 [(Tex. App.—Houston [14th Dist.] 2018), *aff'd in part, rev'd in part*, 631 S.W.3d 40 (Tex. 2021)]. The TCPA does not require that Appellees produce evidence that each and every statement . . . is defamatory to meet their burden under the TCPA[ ] or to prove their cause of action at a trial on the merits. Rather, Appellees must establish "a prima facie case for each essential element" of their defamation claim against [Appellant]. Tex. Civ. Prac. & Rem. Code [Ann.] § 27.005(c).

*Id.* (quoting *Stone*, 2020 WL 6143126, at *6). Thus, our analysis will focus on each element of defamation, not each alleged defamatory statement.

**(iv)    With regard to the first element of defamation, there is prima facie proof that Bookout published a false statement of fact about Shelley to a third party.**

The principles that guide the determination of whether Appellees have established prima facie proof of the first element of their defamation claim are as follows:

- Did Bookout make statements of fact? This determination turns on whether the statements are verifiable. *See Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) ("If a statement is not verifiable as false, it is not defamatory. Similarly, even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in

39

which it was made' discloses that it is merely an opinion masquerading as a fact." (citations omitted) (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002))).

- Did Bookout publish the statements? "'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'" *Exxon Mobile Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) (quoting *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.)).

- Were Bookout's statements false? Because Appellees concede that they are public figures for limited purposes, they bore the burden to establish the statements' falsity. *See Vice v. Kasprzak*, 318 S.W.3d 1, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Bentley*, 94 S.W.3d at 586).

Appellees have shown evidence that Bookout made at least two actionable statements of fact.[18] Bookout's statement that Shelley had physically abused his children and his statement implying that Shelley had embezzled funds from Stedfast

---

[18]In considering whether Appellees have established their prima facie case for defamation, we will consider only those statements that may properly form the basis of a defamation claim under the ecclesiastical abstention doctrine. *See supra* Section III.A.3.a.

are verifiable. Indeed, Bookout stated that he personally witnessed Shelley slap his son "full power" in the face at church—a claim that Shelley vehemently denies. Such eyewitness testimony of an alleged historical event certainly constitutes a verifiable statement of fact. *Cf. S.V. v. R.V.*, 933 S.W.2d 1, 40 (Tex. 1996) (Cornyn, J., concurring on reh'g) (listing an "objective eyewitness's account" as an example of "objectively verifiable evidence").

Appellants assert that Appellees cannot show that Bookout made any actionable statements of fact because the general tenor of Bookout's YouTube channel is satirical. The Texas Supreme Court has stated that in defamation cases involving satire or parody, "the test is whether the publication could be reasonably understood as describing actual facts." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004) (citing *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 442 (10th Cir. 1982)). This inquiry is an objective one, and in applying this test, "courts must analyze the words at issue with detachment and dispassion, considering them in context and as a whole, as the reasonable reader would consider them." *Id.* at 157–58.

Analyzing Bookout's videos under this standard, it is clear that they include actionable statements of fact. For example, according to Shelley, Bookout's exact statements concerning Shelley's alleged child abuse were as follows:

> I don't know how bad of a beating a one year old has to take that they're not able to walk straight or they're not able to develop walking correctly until later, but it couldn't have been a beating that the kid deserved. Not at one. What kind of man does that to his own child, I don't even know. Even another child, a one year old. It's disgusting. And I have every

41

reason to think this is true. First, in my own testimony, I've seen Shelley slap his own kid in the face full power at church, in front of everybody. Another time I saw his kid fall down outside of a restaurant, looked at his mom, and Shelley, you know, came to pick him up, and you saw the kid go from crying to—freeze. Like an animal scared that a predator was gonna eat him. Another one of his boys came to church for a while with a broken limb. But more than just my testimony, the contractor that did work on that guy's house told me that that guy, he was surprised that CPS wasn't going to come take that guy's kids because he would just beat them all just so badly.

By any objective measure, this excerpt contains statements of fact. Bookout is, in essence, testifying as an eyewitness to alleged child abuse. It is difficult to conceive of a more clear-cut example of a statement that could be reasonably understood as describing actual facts. Thus, we reject Appellants' argument that the supposed satirical nature of Bookout's videos prevents Appellees from proving the first element of their defamation claim.

Moreover, the statements were "published." It is undisputed that Bookout made these statements in videos that he posted to YouTube, where they were viewed by people capable of understanding their defamatory import. This satisfies the "publication" requirement. *Cf. Hosseini v. Hansen*, No. 04-17-00790-CV, 2019 WL 1262276, at *3 (Tex. App.—San Antonio Mar. 20, 2019, pet. denied) (mem. op.) (holding statements posted on Facebook that were "liked" and "shared" satisfied the publication requirement for a defamation claim).

With respect to falsity, Shelley has denied ever physically abusing his children or embezzling funds from Stedfast. As we have previously recognized, at the TCPA

42

motion-to-dismiss stage where one party claims an event occurred and the other claims it did not, a plaintiff's denial can satisfy his burden to present prima facie evidence of falsity. *Miller*, 2021 WL 924843, at \*10; *see also Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App.—Fort Worth 2017, pet. denied) (holding plaintiff "met his burden under chapter 27 to establish by clear and specific evidence a prima facie case for the essential element of falsity" by denying the defendant's allegations that he had given money to the Taliban or had told the defendant that he had). Here, as in *Miller*, "the clash between the statement that an action occurred and the denial that it did is evidence that the person making the statement spoke falsely." *Miller*, 2021 WL 924843, at \*11.

Appellants argue that Shelley's denials are insufficient to satisfy Appellees' burden because Appellees could have offered additional evidence such as Stedfast's financial records to prove the falsity of the embezzlement claim.[19] While it is true that Appellees could have produced additional evidence, the issue here is whether they

---

[19]As noted above, in order to satisfy their burden under the second step of the TCPA, Appellees need not establish that *all* of the statements on which they base their defamation claim are false; rather, they can satisfy their burden by showing that any *one* of the statements is false. *See Stone*, 2020 WL 6143126, at \*6. Thus, even if we were to agree with Appellants that the lack of financial records prevents Appellees from establishing the falsity of Bookout's embezzlement allegation, they could still satisfy their burden by showing that Bookout's accusation that Shelley abused his children was false. *See id.* Because Shelley has unequivocally denied abusing his children—and has thus presented prima facie evidence of the falsity of this allegation, *see Miller*, 2021 WL 924843, at \*11—whether Appellees' failure to produce financial records prevents them from being able to show the falsity of Bookout's embezzlement claim is an academic question. However, in the interest of completeness, we address this argument. *See Carr*, 884 S.W.2d at 803.

produced sufficient evidence to establish a prima facie case. Shelley has unequivocally denied misappropriating any funds from Stedfast and has stated that he paid for his home remodel with his personal funds. Moreover, Bookout has admitted that the contractor who performed the remodeling services on Shelley's home provided him with copies of checks Shelley wrote from his own personal bank account to pay for the remodel. Given that a nonmovant satisfies his burden if he presents evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted," we conclude that Shelley's unequivocal denial combined with the corroborative evidence that he used personal checks to pay for his home remodel is sufficient to create a rational inference that Bookout's allegation that Shelley used church funds to pay for the remodel is false. *Lipsky*, 460 S.W.3d at 590. The TCPA does not require nonmovants to marshal *all* of their evidence at this early stage of the litigation but merely "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 223). Appellees have met this burden.

> **(v)** **With regard to the second element of defamation, there is prima facie proof that Bookout's statements about Shelley were reasonably capable of a defamatory meaning.**

The elementary question in establishing that a statement is defamatory turns on whether it "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing

with him." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (quoting Restatement (Second) of Torts § 559 (Am. L. Inst. 1977)). Answering this question involves two independent steps: (1) determining whether the meaning that the plaintiff assigns to the statement is reasonably capable of arising from the text of which the plaintiff complains and (2) determining whether the meaning ascribed to the statement by the plaintiff is reasonably capable of defaming the plaintiff. *Tatum*, 554 S.W.3d at 625. Whether a statement is defamatory is a legal question. *Innovative Block*, 603 S.W.3d at 419–20.

The Texas Supreme Court recently established new categories to address these questions and abandoned—other than for the purpose of presuming general damages—the long-used categories of defamation per se and per quod as descriptors of whether a statement was defamatory "by its text alone."[20] *Tatum*, 554 S.W.3d at 625–26. Under the supreme court's new parlance, "defamation that arises from the statement's text without reference to any extrinsic evidence" is classified as "textual defamation," not defamation per se. *Id.* at 626. On the other hand, "defamation that

---

[20]The supreme court established these new categories for the sake of clarity. *Tatum*, 554 S.W.3d at 626. Before *Tatum*, Texas courts used the terms "defamation per se" and "defamation per quod" to distinguish defamatory statements in two different ways: first, to distinguish between "a statement that is defamatory by its text alone and a statement that is defamatory only by reason of 'extrinsic evidence'" and second, to distinguish "between defamation which is actionable of itself and that which requires proof of special damage." *Id.* at 625–26. Because Texas courts and legal practitioners had begun to use the terms indiscriminately in both senses, the supreme court created new labels for the first type of distinction—whether a statement is defamatory by its text alone or only by reason of extrinsic evidence—to avoid confusion. *Id.* at 626.

*does* require reference to extrinsic circumstances" is categorized as "extrinsic defamation," not defamation per quod. *Id.*

Here, Appellees assert that Bookout has accused Shelley of physically abusing his children and of embezzling money from Stedfast, both of which are crimes. Because being accused of a crime is acknowledged as being obviously harmful to one's reputation, these accusations are reasonably capable of defaming Shelley. *See, e.g., Lipsky*, 460 S.W.3d at 596. Thus, our analysis of whether Appellees have satisfied their burden will focus on the first step of the process promulgated by the supreme court—whether the meaning that Appellees assign to Bookout's publications is reasonably capable of arising from the statements of which they complain. *See Tatum*, 554 S.W.3d at 625.

Bookout's accusation that Shelley physically abused his children is explicitly defamatory and is thus a classic example of textual defamation. *See id.* at 626–27. Bookout's statement that he personally witnessed Shelley slap his child "full power" requires no extrinsic evidence to perceive its defamatory meaning. Thus, this statement is defamatory.

Unlike the accusation of child abuse, Bookout's accusation of embezzlement is not explicit. The allegedly defamatory statement upon which Appellees rely is contained in a YouTube video Bookout posted in August 2021. In the video, Bookout remarks that Shelley "got a house remodel out of the deal," which Shelley interprets as implying that he improperly used church money to pay for the

46

remodeling of his home. As Appellants have pointed out, this statement is not defamatory on its face. The question then is whether this facially innocent statement "becomes defamatory when considered in light of 'other facts and circumstances sufficiently expressed before' or otherwise known to" the viewers of Bookout's YouTube channel. *Id.* at 626 (quoting *Snider v. Leatherwood*, 49 S.W.2d 1107, 1109 (Tex. App.—Eastland 1932, writ dism'd w.o.j.)). We believe that it does. As Bookout acknowledged in the proceedings below, there had been rumors as early as 2019 that Shelley and his mentor Steve Anderson had been stealing money from the church to pay for Anderson's house remodel and that people both inside and outside the church had been questioning Shelley's motivation for becoming Stedfast's pastor. Moreover, Bookout further acknowledges that he posted a video on his YouTube channel in March or April 2020 of Shelley addressing these rumors. According to Bookout, given the rumors of financial misconduct, church members asked him to investigate Shelley's house remodel by getting in touch with the contractor performing the work on Shelley's home, and Bookout did, in fact, obtain images of checks Shelley had provided to the contractor. Bookout proceeded to display these check images in a YouTube video entitled "House Remodel" in which he, in his own words, "juxtapose[d] the check images with statements by . . . Shelley to highlight [the] peculiarity of the content and timing [of] his statements regarding rumored church theft for Anderson's remodel, and his own actual house remodel being conducted shortly thereafter." Given the rumors of financial misconduct and Bookout's

47

previously posted YouTube content, a viewer of Bookout's YouTube channel could reasonably be expected to perceive Bookout's statement that Shelley "got a house remodel out of the deal" as implying that Shelley had embezzled funds from Stedfast. Therefore, this statement is defamatory.

### (vi) With regard to the third element of defamation, there is prima facie proof that Bookout acted with the requisite degree of fault.

As noted above, the "requisite degree of fault" that a defamation plaintiff must prove depends on whether the person defamed is a private individual or a public figure. *Lipsky*, 460 S.W.3d at 593. "A private individual need only prove negligence, whereas a public figure or official must prove actual malice." *Id.* (citing *WFAA–TV*, 978 S.W.2d at 571). As Appellees concede that they are limited-purpose public figures, they are required to prove that Bookout acted with actual malice. *See WFAA–TV*, 978 S.W.2d at 573.

We have recently discussed the imprecise standards governing the actual-malice determination, which turns on the subjective awareness of the defendant regarding the truth of the statements in question but is also impacted to a certain degree by an injurious motive, though that motive is not determinative. *Miller*, 2021 WL 924843, at *15. In *Miller*, we quoted language from an opinion of the Tyler Court of Appeals exploring the parameters of the actual-malice determination, which bears repeating here:

To establish actual malice, a plaintiff must show a defamatory statement was published with either knowledge of its falsity or reckless disregard for its truth. *Lipsky*, 460 S.W.3d at 593. Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003) (citing *Bentley . . .* , 94 S.W.3d [at] 591 . . . ). Mere negligence is not enough. *Id.* "Rather, the plaintiff must establish 'that the defendant in fact entertained serious doubts as to the truth of his publication,' or had a 'high degree of awareness of . . . [the] probable falsity' of the published information." *Id.* (quoting *Harte–Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696 . . . (1989)). The evidence must be viewed in its entirety. *Campbell* [*v. Clark*], 471 S.W.3d [615,] 629 [(Tex. App.—Dallas 2015, no pet.)]. Further, "[a] defendant's state of mind 'can—indeed, must usually—be proved by circumstantial evidence.'" *Id.* (quoting *Bentley*, 94 S.W.3d at 591). Specifically, the supreme court stated the following:

> A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is.

*Id.* (quoting *Bentley*, 94 S.W.3d at 597). In addition, the supreme court stressed that proof of actual malice is not defeated by a defendant's self-serving protestation of sincerity. *Id.*

*Miller*, 2021 WL 924843, at *15–16 (quoting *MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 942–43 (Tex. App.—Tyler 2019, pet. denied)). Actual malice must be established by clear and convincing evidence. *Bentley*, 94 S.W.3d at 596.

Appellees have presented prima facie proof that Bookout acted with actual malice. First, as Appellees point out, Bookout has acknowledged that the contractor who remodeled Shelley's home provided him with copies of the checks Shelley wrote

to pay for the remodeling services and that these checks were written on Shelley's personal account, not Stedfast's. Thus, at the time Bookout made the statement implying that Shelley had embezzled funds to pay for his house remodel, Bookout was in possession of evidence that, though short of conclusive proof of innocence, was nonetheless exculpatory.

Moreover, with regard to Bookout's statement that he witnessed Shelley slap his child "full power" across the face, Shelley categorically denies that this event ever took place. As we have previously recognized, "actual malice may be inferred if the plaintiff demonstrates that the defamatory statement had no basis in fact, was fabricated by the defendant, or was the product of her imagination." *Miller*, 2021 WL 924843, at *17 (quoting *Ratner v. Kohler*, Civ. No. 17-00542 HG-KSC, 2018 WL 1055528, at *9 (D. Haw. 2018) (order)); *see also Bentley*, 94 S.W.3d at 596 ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant[ or] is the product of his imagination . . . ." (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S. Ct. 1323, 1326 (1968))). Thus, where, as here, two parties have dramatically opposed versions of events, a plaintiff's claim of falsity is evidence both that the statement was false and that the defendant necessarily knew it was false at the time he said it because—if the plaintiff's version of events is correct—it never occurred. *See Miller*, 2021 WL 924843, at *17 (citing *Chastain v. Hodgdon*, No. 16-2087, 2016 WL 5109944, at *2 (D. Kan. Sept. 20, 2016) (mem. & order)).

Further, though an injurious motive is not determinative of actual malice, it is a factor that may be considered. *See Campbell*, 471 S.W.3d at 629 (quoting *Bentley*, 94 S.W.3d at 597). Here, Appellees have presented evidence that Bookout had a falling out with Shelley and that, in addition to launching what Shelley describes as a "smear campaign" against him, Bookout posted documents containing Shelley's social security number and other sensitive personal information on YouTube accompanied by the caption "Who wants to open a credit card?" This evidence raises an inference of an injurious motive and, in combination with the other evidence, is relevant to Bookout's subjective belief regarding whether his statements were true. Thus, the record supports an inference that Bookout acted with actual malice.

### (vii) Because Bookout's statements constitute defamation per se, Appellees are not required to prove damages.

As we noted above, though the terms defamation per se and defamation per quod have fallen out of favor in describing the defamatory sting of a statement, they remain viable in determining whether the statement produces a presumption of damage.[21] *Tatum*, 554 S.W.3d at 626. "Historically, defamation *per se* has involved

---

[21]In their briefing, Appellants argue that because Bookout's statement that Shelley "got a house remodel out of the deal" requires extrinsic evidence to show its defamatory meaning, it does not constitute defamation per se, and therefore, Appellees must present evidence of damages. This argument reflects Appellants' confusion regarding the usage of the terms defamation per se and defamation per quod to describe a statement's defamatory sting as opposed to its presumption of damage. As set forth above, under the Texas Supreme Court's new categorization framework, whether a statement is explicitly defamatory or requires extrinsic evidence to show its defamatory nature now categorizes it as either "textual defamation" or

statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages." *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). Again, "[a]ccusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se." *Lipsky*, 460 S.W.3d at 596.

With certain qualifications,[22] the existence of defamation per se permits a presumption of general damages. *Miller*, 2021 WL 924843, at *18. Thus, prima facie proof of a viable defamation per se claim obviates the need for a party responding to a TCPA motion to dismiss to present clear and specific evidence of damages. *Lipsky*, 460 S.W.3d at 596 ("Pleading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply.").

Here, Appellees have presented prima facie evidence that Bookout accused Shelley of two potential crimes: child abuse and embezzlement. We therefore consider these statements to be defamatory per se and conclude that the presumption

"extrinsic defamation." *See supra* note 20. A statement that imputes the commission of a crime constitutes defamation per se regardless of whether extrinsic evidence is required to show its defamatory meaning. *See Tatum*, 554 S.W.3d at 625–26.

[22]The Texas Supreme Court has explained that "the Constitution only allows juries to presume the existence of general damages in defamation *per se* cases where: (1) the speech is not public, or (2) the plaintiff proves actual malice." *Hancock*, 400 S.W.3d at 65–66 (first citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S. Ct. 2939, 2946 (1985); and then citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50, 94 S. Ct. 2997, 3011–12 (1974)). Because, as detailed above, Appellees have presented proof of actual malice, this requirement is met.

of general damages frees Appellees from having to present prima facie proof of damages.

### c. Defamation Step Three: Bookout's Affirmative Defenses

Having determined that Appellees have presented clear and specific evidence establishing a prima facie case for each essential element of their defamation claim, we must now consider whether Bookout has established an affirmative defense that would entitle him to judgment as a matter of law. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)–(d). In the trial court, Bookout asserted two affirmative defenses to Appellees' defamation claim: statute of limitations and qualified privilege.[23] However, because Appellants' initial brief in this court makes no mention of either defense, we consider both of these defenses to have been waived for purposes of this appeal.

None of Appellants' briefing makes any reference whatsoever to the defense of qualified immunity. Thus, this defense has been waived. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Jackson v. Vaughn*, 546 S.W.3d 913, 922 (Tex. App.—Amarillo 2018, no pet.) (finding issue waived due to inadequate briefing); *City of Alton v. City of Mission*, 164 S.W.3d 861, 870 (Tex. App.—Corpus

---

[23]We note that in their brief, Appellees referenced "[s]tatements are [o]pinions" as a defense asserted by Appellants. However, whether a statement asserts a verifiable fact or constitutes the mere expression of an opinion is part of the first element of defamation, not an affirmative defense. *See Bentley*, 94 S.W.3d at 579–81.

Christi–Edinburg 2005, pet. denied) (holding appellant's asserted fact issue related to an affirmative defense had been waived due to inadequate briefing).

Moreover, while Appellants assert in their reply brief that Bookout's alleged statements accusing Shelley of child abuse are barred by the statute of limitations, this argument was not raised in their initial brief in this court. The Texas Rules of Appellate Procedure do not allow parties to add a new issue in their reply brief that was not discussed in their original brief. *See* Tex. R. App. P. 38.3; *Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 803 (Tex. App.—Dallas 2013, no pet.); *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pets. denied); *see also Molho v. Weichert, Realtors Reichardt & Assocs.*, No. 14-11-00861-CV, 2012 WL 6631732, at *3 n.6 (Tex. App.—Houston [14th Dist.] Dec. 20, 2012, pet. denied) (mem. op.) ("Arguments may not be raised for the first time in a reply brief." (citing *Brown v. Green*, 302 S.W.3d 1, 13–14 (Tex. App.—Houston [14th Dist.] 2009, no pet.))). Thus, this defense has also been waived for purposes of this appeal. *See Stovall*, 409 S.W.3d at 803 ("[A]n issue raised for the first time in a reply brief is ordinarily waived and may not be considered by this Court.").

Even if the limitations defense had not been waived, it still would not entitle Bookout to judgment as a matter of law. By Appellants' own admission, the limitations defense only applies to Bookout's alleged statements accusing Shelley of child abuse, not his statement implying that Shelley embezzled money from Stedfast to pay for a home remodel. Thus, even assuming Bookout's limitations defense were

valid, Appellees would still have a viable defamation claim, and Bookout would not be entitled to judgment as a matter of law. *See Stone*, 2020 WL 6143126, at \*6–7 (holding that a defamation plaintiff can meet its burden under the second step of the TCPA by presenting prima facie proof of any statement upon which the defamation claim is based and concluding that "each alleged defamatory statement is not a separate 'legal claim' under the TCPA").

Because Appellees have presented clear and specific evidence establishing a prima facie case for each essential element of their defamation claim and Bookout has not established an affirmative defense that would entitle him to judgment as a matter of law, we overrule Appellants' fourth issue.

### d. Declaratory Relief and Conversion Causes of Action Step One: Does the TCPA Apply?

In their fifth and sixth issues, Appellants assert that the trial court erred in denying their motion to dismiss Appellees' causes of action for declaratory relief and conversion. Because Appellees contend that the TCPA does not apply to these causes of action, we must first address whether Appellants have satisfied their initial burden to demonstrate that these claims are "based on" or "in response to" an exercise of Appellants' rights of free speech, petition, or association as defined in the Act. Tex. Civ. Prac. & Rem. Code § 27.003(a).

Appellants argue that Appellees' declaratory judgment and conversion causes of action are subject to the TCPA because they are "based on" or were filed "in

55

response to" Appellants' exercise of the right of association. *See id.* Under the TCPA, "'[e]xercise of the right of association' means to join together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern." *Id.* § 27.001(2). "'Matter of public concern' means a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Id.* § 27.001(7). Thus, the applicability of the TCPA to these causes of action turns on whether Appellants, by (1) holding a meeting to appoint Gallagher and Bookout as directors of Stedfast and to appoint themselves as officers, (2) purporting to terminate Shelley for cause, (3) seizing control of Stedfast's bank accounts, and (4) seeking to investigate Stedfast's finances and wind down its affairs, joined together to collectively pursue or defend "common interests" relating to "a matter of public concern."

Appellees, relying on our decision in *Kawcak v. Antero Resources Corporation*, 582 S.W.3d 566 (Tex. App.—Fort Worth 2019, pet. denied), assert that Appellants have not carried their burden to show that the TCPA applies to Appellees' declaratory judgment and conversion claims because they have not shown that they were acting to pursue or defend "common interests." In *Kawcak*, following a "straightforward but admittedly long" analysis, we determined that the word "common" as used in the TCPA "requires more than two tortfeasors conspiring to act tortiously for their own

56

selfish benefit." *Id.* at 573, 588. Appellees argue that Appellants have only shown that they joined together to pursue their own selfish interests and that there is no evidence in the record to suggest that the supposedly "common interest" to dissolve Stedfast was shared by anyone other than Appellants themselves. Thus, according to Appellees, the interests pursued or defended by Appellants are not "common" as defined by this court in *Kawcak*.

However, as Appellants point out, the present case is distinguishable from *Kawcak*. Unlike the appellant in *Kawcak*, who candidly admitted to conspiring to engage in tortious and illegal behavior,[24] Appellants' sole motivation in joining together was not to commit a tort. Indeed, both Romero and Gallagher have testified that their motivation was to investigate and provide full transparency of Stedfast's finances. Bookout similarly—albeit vaguely—testified that Appellants' motivation was "to follow the law." If—as Appellants claim—Shelley was misappropriating Stedfast's funds, this would be a matter of common concern for all church members. Thus, Appellants have provided evidence that they joined together to pursue or defend a "common interest."

Moreover, we do not view Appellees' status as public figures to be reasonably in doubt. Indeed, Appellees have conceded that they are, at a minimum, limited-purpose public figures under the standards relevant to their defamation claim, and they have not challenged Appellants' assertion that they are public figures for

---

[24]*See generally id.* at 569–71.

57

purposes of the TCPA. As Appellants point out, the management of Stedfast's affairs has been an ongoing topic of public discussion and has been the subject of several national news articles. Thus, there is evidence that the "common interests" Appellants joined together to defend or pursue relate to a "matter of public concern" as defined in the TCPA.

Further, it is clear that Appellees' causes of action for declaratory judgment and conversion are "based on" or were filed "in response to" Appellants' actions in joining together to investigate Stedfast's finances and wind down its affairs. Both causes of action center around whether Appellants or the Shelley Group are the rightful directors of Stedfast. But for Appellants' actions in joining together to assert control of Stedfast, neither cause of action would have been filed.

Thus, Appellants have met their burden to show that Appellees' declaratory judgment and conversion causes of action are "based on" or "in response to" Appellants' "exercise of the right of association" as defined in the TCPA. Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001(2), .003(a). Accordingly, we must now proceed to the second step of our TCPA analysis of these claims.

### e.    Conversion Step Two:  Prima Facie Case

Having determined that Appellants have satisfied their initial burden to invoke the TCPA as to Appellees' conversion and declaratory judgment claims, we must

now—guided by the same principles set forth above[25]—consider whether Appellees have presented clear and specific evidence establishing a prima facie case for each essential element of these claims. We will first consider Appellees' evidence of conversion.

### (i) There are three elements of conversion.

To prevail on a claim for conversion, a plaintiff must show that (1) he owned, possessed, or had the right to immediate possession of personal property; (2) the defendant unlawfully and without authorization exercised dominion or control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; and (3) the plaintiff suffered injury.[26] *Truitt v. Hatfield*, No. 02-21-00004-CV, 2021 WL 5742083, at *5 (Tex. App.—Fort Worth Dec. 2, 2021, no pet.) (mem. op.) (first citing *United Mobile Networks*, 939 S.W.2d at 147–48; and then citing *Lopez*, 271 S.W.3d at 784).

---

[25]*See supra* Section III.B.3.b.(i).

[26]The parties, relying on two opinions from the Dallas Court of Appeals, seem to agree that a plaintiff must also show that he demanded return of the property and that the defendant refused to return it. *See Bailey v. Gallagher*, 348 S.W.3d 322, 328 (Tex. App.—Dallas 2011, pet. denied); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365–66 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g). However, as discussed more fully below, when, as in the present case, the defendant's actions constitute a clear repudiation of the plaintiff's rights, demand of return is not required. *See, e.g., Burns v. Rochon*, 190 S.W.3d 263, 270 n.2 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Presley v. Cooper*, 284 S.W.2d 138, 141 (Tex. 1955)).

**(ii) With regard to the first element of conversion, there is prima facie evidence that Stedfast owned, possessed, or had the right to immediate possession of personal property.**

There is ample record evidence to show—and Appellants do not dispute—that Stedfast maintained deposit accounts at Chase Bank, that Shelley and another church employee were the signatories on those accounts, and that Stedfast owned, possessed, or had the right to immediate possession of those funds. Thus, to the extent that Stedfast's bank accounts constitute personal property that may be the proper subject of a conversion claim,[27] Appellees have satisfied their burden with respect to this element.

---

[27]While we reserve judgment on this issue, we note that there is case law suggesting that though special deposits—which are accompanied by an agreement that the identical deposit will be returned or paid out for a specific purpose—can be converted, general bank deposits—which create a debtor–creditor relationship between the bank and the depositor—cannot. *See Hodge v. N. Tr. Bank of Tex., N.A.*, 54 S.W.3d 518, 522 (Tex. App.—Eastland 2001, pet. denied); *cf. Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.—Dallas 1992, writ denied) (op. on reh'g) ("An action for the conversion of money will lie if the money can be identified as a specific chattel. [But] '[w]hen an indebtedness can be discharged by payment of money generally, an action in conversion is inappropriate.'" (citation omitted) (quoting *Eckman v. Centennial Sav. Bank*, 757 S.W.2d 392, 398 (Tex. App.—Dallas 1988, writ denied))). However, we also recognize that the first element of conversion concerns ownership or possession of personal property and that the Texas version of the Uniform Commercial Code identifies deposit accounts as a form of personal property. *See* Tex. Bus. & Com. Code Ann. § 9.102(a)(42) (defining "general intangibles" to mean "any personal property, including things in action, other than . . . deposit accounts"); *see also id.* § 9.102(a)(29) (defining "deposit account" to mean "a demand, time, savings, passbook, or similar account maintained with a bank"). *But see Express One Int'l v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.) (noting that intangible property cannot be the subject of a conversion claim "except in cases where an underlying intangible right has been merged into a document and that document has

**(iii)** **With regard to the second element of conversion, there is prima facie evidence that Appellants unlawfully and without authorization exercised dominion or control over Stedfast's bank accounts.**

It is also undisputed that in September 2021, Appellants exercised dominion or control over the accounts by taking action to remove Shelley as a signatory, by replacing him with Bookout, and by subsequently depositing the funds from these accounts into a new account at North Dallas Bank and Trust for which Bookout was the sole signatory. Thus, it is undisputed that Appellants exercised dominion or control over Stedfast's bank accounts. The issue then is whether Appellees have presented clear and specific evidence to show that Appellants' actions were "unlawful" and "without authorization." We conclude that they have.

Shelley's affidavit and Stedfast's corporate records, including board minutes, support Appellees' position that Appellants were not directors of Stedfast at the time that they changed the signatories on Stedfast's bank accounts. As this evidence is sufficient to support a rational inference that Appellants acted unlawfully and without authorization when they took control of Stedfast's bank accounts, Appellees have satisfied their burden under the second step of the TCPA. *See Lipsky*, 460 S.W.3d at 590.

---

been converted" (citing *Neles–Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997) (mem. & order))). Appellants' briefing concerning Appellees' prima facie case for conversion—which focuses on Appellees' failure to present evidence that they made a demand for a return of the property or that Appellants refused this demand—does not raise the issue of whether general deposits held by a bank can be the proper subject of a conversion claim. Nor was this issue raised in the trial court. Therefore, for purposes of this interlocutory appeal, we will assume without deciding that the bank accounts in question are the proper subject of a conversion cause of action.

### (iv) With regard to the third element of conversion, there is prima facie evidence that Appellees suffered injury.

Generally, the injury suffered by a conversion plaintiff is the loss of the converted property; thus, the measure of damages is generally the fair market value of the property at the time of the conversion. *See United Mobile Networks*, 939 S.W.2d at 147–48 ("Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion."). Here, Appellees have presented evidence showing that Stedfast's bank accounts contained almost $140,000 at the time Appellants exercised control over them and that Appellants subsequently used $40,000 of these funds to pay their attorneys.[28] Moreover, Shelley testified regarding the "extreme harm" that Stedfast suffered as a result of losing its access to its bank accounts:

> It's disrupted payroll, paying bills, checks. It's made it where we're not able to deposit tithes. Our online giving was shut down. It's caused us to have to seek all kinds of remedies to continue operation as a church. It's very detrimental to our business operations.

Therefore, we conclude that there is prima facie evidence that Appellees suffered injury.

### (v) Appellees were not required to prove that they made a formal demand for the return of the funds.

In their briefing, Appellants make much of the fact that Appellees have presented no evidence that they made a formal demand for the return of the property. However, demand of return is not always required. *See First State Bank, N.A. v. Morse*,

---

[28]These funds, including the amounts paid to Appellants' attorneys, were ultimately deposited into the trial court's registry.

62

227 S.W.3d 820, 827–28 (Tex. App.—Amarillo 2007, no pet.) (first citing *Autry v. Dearman*, 933 S.W.2d 182, 191–92 (Tex. App.—Houston [14th Dist.] 1996, writ denied); and then citing *McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex. App.—Corpus Christi–Edinburg 1979, no writ)); *Burns*, 190 S.W.3d at 270 n.2 (citing *Presley*, 284 S.W.2d at 141); *Bures v. First Nat'l Bank of Port Lavaca*, 806 S.W.2d 935, 938 (Tex. App.—Corpus Christi–Edinburg 1991, no writ) (first citing *McVea*, 587 S.W.2d at 531; then citing *Loomis v. Sharp*, 519 S.W.2d 955, 958 (Tex. App.—Texarkana 1975, writ dism'd); then citing *Neyland v. Brammer*, 73 S.W.2d 884, 887 (Tex. App.—Galveston 1933, writ dism'd); and then citing *Presley*, 284 S.W.2d at 140–41)). Specifically, demand and refusal are not required if other evidence establishes the act of conversion, *Burns*, 190 S.W.3d at 270 n.2, if the demand would have been useless, *McVea*, 587 S.W.2d at 531, or if the defendant's acts amount to a clear repudiation of the owner's rights. *Loomis*, 519 S.W.2d at 958; *Neyland*, 73 S.W.2d at 887. Thus, demand of return is not a required element of a conversion claim. *See Truitt*, 2021 WL 5742083, at *5 (listing elements); *O'Connor's Texas Causes of Action* ch. 6, § 1.1 (2022) (same).

As the court explained in *Burns*, the purpose of demand and refusal is to demonstrate conversion in situations such as bailment where the exercise of unauthorized dominion or control over property cannot otherwise be shown:

> The purpose of demand and refusal is most effectively illustrated in bailment, where "a conversion by the bailee cannot otherwise b[e] shown than by his refusal to comply with the demand for possession." [*Presley*, 284 S.W.2d at 141.] Here, [Appellant]'s wrongful seizure of the equipment represented a clear act of conversion. Thus, although the trial

63

court found that demand and refusal did occur, such findings were not strictly necessary for [Appellee] to prevail.

190 S.W.3d at 270 n.2. Thus, when the act of conversion is clear, demand and refusal are not required. *See id.*; *Bures*, 806 S.W.2d at 938.

Here, Appellants' actions to remove Shelley as a signatory on the accounts and to replace him with Bookout—thereby denying Appellees access to the funds—constituted a clear repudiation of Appellees' rights. Accordingly, demand and refusal were not required.

### f. Conversion Step Three: Affirmative Defenses

Having determined that Appellees have established a prima facie case for each essential element of their conversion claim by clear and specific evidence, we must now consider whether Appellants have established an affirmative defense that would entitle them to judgment as a matter of law.

In the trial court, Appellants asserted unclean hands as an affirmative defense to Appellees' conversion claim,[29] but they have not raised this defense in their appellate briefing. We therefore consider this defense to have been waived for purposes of this appeal. *See* Tex. R. App. P. 38.1(i); *Jackson*, 546 S.W.3d at 922; *City of Alton*, 164 S.W.3d at 870.

---

[29]In their reply in support of their motion to dismiss, Appellants included both unclean hands and laches in the section of their brief labeled "Affirmative Defenses to Conversion," but their actual argument concerning the laches defense focused solely on Appellees' declaratory judgment action.

64

Because Appellees have presented prima facie proof of each essential element of their conversion claim and Appellants have not established an affirmative defense, the trial court did not err in denying Appellants' motion to dismiss this cause of action pursuant to the TCPA. Accordingly, we overrule Appellants' fifth issue.

### g. Declaratory Judgment Step Two: Prima Facie Case

As noted above, having determined that Appellants have satisfied their initial burden to invoke the TCPA regarding Appellees' declaratory judgment cause of action, we must now—as step two of our TCPA analysis—consider whether Appellees have presented clear and specific evidence establishing a prima facie case for each essential element of this claim.

#### (i) There are two essential elements of a declaratory judgment cause of action.

The Uniform Declaratory Judgment Act (UDJA) provides that

> [a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). The UDJA "'is to be liberally construed and administered.'" *Shannon v. Blair*, No. 04-21-00257-CV, 2022 WL 4492801, at *3 (Tex. App.—San Antonio Sept. 28, 2022, no pet. h.) (mem. op.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 37.002(b)).

65

"There are two prerequisites for a declaratory judgment action: (1) there must be a real controversy between the parties and (2) the controversy must be one that will actually be determined by the judicial declaration sought."[30] *Nehls v. Hartman Newspapers, LP*, 522 S.W.3d 23, 29 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *Hous. Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 399 (Tex. App.—Houston [1st Dist.] 2006, no pet.)); *see also Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 685

---

[30]In their briefing, Appellants—based on their own interpretation of the UDJA and without citing any authority—assert that there are three essential elements to a declaratory judgment claim: (1) an actual controversy; (2) a writing; and (3) a valid contract. However, Appellants' reading of the statute is flawed. The UDJA is not limited to controversies involving written contracts. Indeed, the language of Section 37.004 quoted above makes clear that

> [a] person interested under a deed, will, written contract, or other writings constituting a contract *or whose rights, status, or other legal relations are affected by a statute* . . . may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (emphasis added). Appellants' reading of the statute ignores the language emphasized above. Thus, Appellants were not required to prove the existence of a written contract as part of their prima facie case for declaratory relief. Because Stedfast is incorporated as a nonprofit under the laws of Texas, the rights, status, and legal relations of Appellants and the Shelley Group are affected by Chapter 22 of the Texas Business Organizations Code. Therefore, the controversy that Appellees seek to resolve is the proper subject of a declaratory judgment action. *Cf. Lee*, 2019 WL 1033869, at *1–3 (affirming declaratory judgment regarding, *inter alia*, the composition of the board of trustees of a church incorporated as a nonprofit corporation under the Texas Business Organizations Code); *Hous. Aeronautical Heritage Soc'y, Inc. v. Graves*, No. 01-12-00443-CV, 2013 WL 6506301, at *7–10 (Tex. App.—Houston [1st Dist.] Dec. 10, 2013, no pet.) (mem. op.) (addressing merits of appeal from summary judgment granting declaratory relief regarding validity of corporate bylaws and composition of corporation's board of directors).

(Tex. 2020) ("[A] declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." (quoting *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995))). "To establish these elements, '[a] person seeking a declaratory judgment need not have incurred actual injury.'" *Shannon*, 2022 WL 4492801, at *3 (quoting *City of San Antonio v. Greater San Antonio Builders Ass'n*, No. 04-12-00745-CV, 2013 WL 2247468, at *3 (Tex. App.—San Antonio May 22, 2013, no pet.) (mem. op.)).

### (ii) Appellees have established both elements of their declaratory judgment cause of action by clear and specific evidence.

As Appellants concede, Appellees have presented evidence that there is a controversy. Indeed, as has been shown above, the controversy regarding whether Appellants or the Shelley Group are the duly elected members of Stedfast's board of directors is at the heart of this entire lawsuit. Thus, on the record before us, the existence of a controversy is unquestionable.

Moreover, the judicial declaration sought by Appellees will resolve this controversy. As set forth in more detail above,[31] Appellees seek a declaration that, among other things, the Shelley Group—not Appellants—are the duly elected and appointed members of Stedfast's board and that Shelley is Stedfast's duly appointed and ordained pastor. Thus, the declaratory relief sought by Appellees will resolve the

---

[31] *See supra* Section III.A.3.b.

controversy surrounding Stedfast's leadership and the status of both Appellants and the Shelley Group.

Further, though not strictly necessary to avoid dismissal under the TCPA,[32] Appellees have presented clear and specific evidence showing that they are entitled to the declaratory relief sought. This evidence includes affidavit testimony from two of the three original members of Stedfast's board as well as documentary evidence memorializing the original board members' action to replace themselves with Shelley, Urbanek, and Edelmann.

Accordingly, viewing—as we must—the pleadings and other evidence under Section 27.006(a) of the Texas Civil Practice & Remedies Code in the light most favorable to Appellees, we conclude that they have satisfied their step-two prima facie burden on both elements of their declaratory judgment claim.

---

[32] *See Choudhri v. Lee*, No. 01-20-00098-CV, 2020 WL 4689204, at *4 (Tex. App.—Houston [1st Dist.] Aug. 13, 2020, pet. denied) (mem. op.) (affirming denial of TCPA motion based, in part, on conclusion that prima facie case for declaratory judgment claim was established where dispute about the validity and enforceability of the parties' agreement could be resolved by a declaration construing the agreement in light of the parties' conduct); *Perez v. Quintanilla*, No. 13-17-00143-CV, 2018 WL 6219627, at *4 (Tex. App.—Corpus Christi–Edinburg, Nov. 29, 2018, no pet.) (mem. op.) (affirming denial of TCPA motion based, in part, on conclusion that prima facie case for declaratory judgment claim was established where pleadings and evidence reflected a justiciable controversy existed regarding enforceability and scope of the parties' agreement and the trial court was left to determine whether or not to grant the declaratory relief sought in order to resolve it).

### h.   Declaratory Judgment Step Three:   Affirmative Defenses

Having determined that Appellees have established a prima facie case for each essential element of their request for declaratory relief by clear and specific evidence, we must now consider—as the third and final step in our TCPA analysis—whether Appellants have established an affirmative defense that would entitle them to judgment on this claim as a matter of law.

The sole affirmative defense asserted by Appellants in response to Appellees' declaratory judgment cause of action is laches.  "There are two elements to a laches defense:  (1) an unreasonable delay by the party asserting legal or equitable rights, and (2) a good faith change of position by another to his detriment because of the delay." *SignAd, Ltd. v. BJZ Invs., LLC*, 640 S.W.3d 611, 622 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (citing *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964)).  As an affirmative defense, laches must be properly pleaded and proved.  Tex. R. Civ. P. 94; *Knesek v. Witte*, 754 S.W.2d 814, 816 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (citing *Culver v. Pickens*, 176 S.W.2d 167, 170 (Tex. 1943)).  Laches generally may be applied only in cases involving an equitable right and may not be used to resist the enforcement of a purely legal right.  *Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412, 415 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied); *see also Att'y Gen. of Tex. ex rel. Ford v. Daurbigny*, 702 S.W.2d 298, 300 (Tex. App.—Houston

[1st Dist.] 1985, no writ) (holding laches is only available against an assertion of equitable rights, not a claim based on an express statutory duty).

Here, Appellants' laches defense fails for several reasons. First, Appellants failed to plead the defense as required by Rule 94—or even to raise it in their motion to dismiss. *See* Tex. R. Civ. P. 94; *Knesek*, 754 S.W.2d at 816. Rather, they raised it for the first time in their reply in support of the motion. As a result, the defense was waived, and we need not consider it. *See Cont'l Homes of Tex., L.P. v. City of San Antonio*, 275 S.W.3d 9, 15 (Tex. App.—San Antonio 2008, pet. denied) ("Failure to plead an affirmative defense generally waives it." (first citing *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992); and then citing *Komet v. Graves*, 40 S.W.3d 596, 602 (Tex. App.—San Antonio 2001, no pet.))); *see also Wyly*, 502 S.W.3d at 907; *Mei-Chiao Chen Wu*, 2013 WL 4084721, at *5; *LaRue*, 167 S.W.3d at 876. Moreover, because laches generally may only be applied in cases involving an equitable right, *Wayne*, 52 S.W.3d at 415, we question its applicability to an action for declaratory relief under the UDJA, which, "as the Texas Supreme Court observed long ago, 'is neither legal nor equitable, but sui generis.'" *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 298 (Tex. App.—Austin 2018, pet. denied) (quoting *Cobb v. Harrington*, 190 S.W.2d 709, 713 (Tex. 1945)).

Even apart from these issues, Appellants' laches defense fails on the merits. With respect to the first element, Appellants have not shown that Appellees' failure to file documentation with the Texas Secretary of State reflecting the change in the

70

composition of Stedfast's board constitutes an unreasonable delay in asserting a legal right in the face of Appellants' actions. *See Wildman v. Patrizi*, No. 05-20-00834-CV, 2022 WL 3655242, at \*6 (Tex. App.—Dallas Aug. 25, 2022, no pet.) (mem. op.) ("The defendant must show the plaintiff's delay was unreasonable in the face of the defendant's actions." (citing *Dempsey v. Apache Shores Prop. Owners Ass'n*, 737 S.W.2d 589, 596 (Tex. App.—Austin 1987, no pet.))). Shelley has testified that he was unaware that he was required to file any such documentation with the Secretary of State. And by all accounts, he exercised control over Stedfast's affairs without incident or challenge until Appellants purported to terminate him and removed him as a signatory on Stedfast's bank accounts. After Appellants took action to challenge the Shelley Group's status as Stedfast's duly elected board of directors, Appellees promptly filed a Restated Certificate of Formation for Stedfast naming the members of the Shelley Group as directors and commenced this lawsuit seeking, among other things, the declaratory relief at issue. This fact pattern is hardly indicative of a party sleeping on his rights. *See Condom Sense, Inc. v. Alshalabi*, 390 S.W.3d 734, 758 (Tex. App.—Dallas 2012, no pet.) ("A laches defense embodies the principle that 'equity aids the vigilant and not those who slumber on their rights.'" (quoting *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 708 (5th Cir. 1994))).

Further, even if Appellants could show unreasonable delay on the part of Appellees in asserting a legal right, they have offered no evidence that they changed their position to their detriment in good faith as a result of such delay. *See Caldwell v.*

71

*Barnes*, 975 S.W.2d 535, 538 (Tex. 1998). The only supposed change in position to which Appellants point in their briefing is that Romero "maintained that she did not resign as a director." However, this does not reflect the type of good faith detrimental change of position that would satisfy the second element of a laches defense and, in actuality, is not a change of position at all. By maintaining that she did not resign as a director, all Romero did, in essence, was assert a legal position—one which, as has been shown, is at the very center of the present lawsuit. If Appellants' version of events is the correct one, Romero never ceased being a director of Stedfast. Thus, her position has not changed. Nor have Appellants presented any evidence showing that Romero's legal position has been prejudiced in any way by Appellees' delay in filing documentation with the Texas Secretary of State. *See Caldwell*, 975 S.W.2d at 539 (citing *Culver*, 176 S.W.2d at 170–71)); *see also Condom Sense*, 390 S.W.3d at 758 ("Courts commonly define laches as 'an inexcusable delay that results in prejudice to the defendant.'" (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998))). Thus, Appellants have failed to establish their laches defense.

Because Appellees established each essential element of their declaratory judgment cause of action by clear and specific evidence and Appellants have not established an affirmative defense that would entitle them to judgment as a matter of law, the trial court did not err in denying Appellants' motion to dismiss this claim under the TCPA. Accordingly, we overrule Appellants' sixth issue.

### i.     Appellees' Attorney's Fees

In their seventh issue, Appellants assert that the trial court erred in awarding Appellees attorney's fees and costs based upon its finding that Appellants' motion to dismiss was frivolous or filed solely for the purpose of delay.

If the trial court finds that a motion to dismiss under the TCPA is frivolous or solely intended to delay, the court may award court costs and reasonable attorney's fees to the nonmoving party. Tex. Civ. Prac. & Rem. Code Ann. § 27.009(b). We review the trial court's decision to award attorney's fees under the TCPA for an abuse of discretion. *Caliber Oil & Gas, LLC v. Midland Visions 2000*, 591 S.W.3d 226, 242 (Tex. App.—Eastland 2019, no pet.); *Sullivan v. Tex. Ethics Comm'n*, 551 S.W.3d 848, 857 (Tex. App.—Austin 2018, pet. denied). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without regard to guiding principles. *Caliber*, 591 S.W.3d at 242–43; *Sullivan*, 551 S.W.3d at 857; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The TCPA does not define "frivolous." *Caliber*, 591 S.W.3d at 243; *Sullivan*, 551 S.W.3d at 857. However, courts that have addressed this issue have noted that the "common understanding" of the word "contemplates that a claim or motion will be considered frivolous if it has no basis in law or fact and lacks a legal basis or legal merit." *Sullivan*, 551 S.W.3d at 857; *see Caliber*, 591 S.W.3d at 243 (following *Sullivan*); *Pinghua Lei v. Nat. Polymer Int'l Corp.*, 578 S.W.3d 706, 717 (Tex. App.—Dallas 2019, no pet.) (same). "The fact that a TCPA motion to dismiss is ultimately denied is not

sufficient, standing alone, to support a finding that the motion was frivolous." *Keane Frac, LP v. SP Silica Sales, LLC*, 608 S.W.3d 416, 433 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Caliber*, 591 S.W.3d at 244).

Appellants argue that the trial court erred in awarding Appellees attorney's fees because at least one of Appellees' claims falls within the scope of the TCPA.[33] According to Appellants, though the trial court did not issue findings of fact or conclusions of law, it must have implicitly ruled that none of Appellees' claims fell within the scope of the TCPA given its determination that Appellants' motion to dismiss was frivolous or filed solely for purposes of delay. However, this is not necessarily the case. The question of whether a motion to dismiss is frivolous or filed solely for purposes of delay does not begin and end with the first step of the TCPA analysis. If, prior to filing its motion to dismiss under the TCPA, a defendant was aware of clear and specific evidence with which the plaintiff could meet its burden to establish a prima facie case on each essential element of its claims, then the motion to dismiss could still be frivolous even though the plaintiff's claims fall under the auspices of the TCPA. *See Pinghua Lei*, 578 S.W.3d at 717–18; *see also Mosaic Baybrook One LP v. Cessor*, No. 14-19-00514-CV, 2021 WL 2656613, at *11 (Tex. App.—Houston [14th Dist.] June 29, 2021, pet. dism'd) (mem. op.) (agreeing that "even if the broad definitions of the TCPA technically apply to a claim, a TCPA motion to

---

[33]As set forth above, we have concluded that, in fact, all three of Appellees' claims fall within the scope of the TCPA. *See supra* Sections III.B.3.b., d.

74

dismiss can still be frivolous as to the merits of the plaintiffs' claims"). Thus, the mere fact that Appellants could satisfy their burden under the first step of the TCPA analysis with respect to one—or even all—of Appellees' claims does not, in and of itself, require a reversal of the trial court's award of attorney's fees to Appellees.

Based on the record before us, we cannot say that the trial court abused its discretion in awarding attorney's fees to Appellees. At the time that Appellants filed their TCPA motion, the trial court had already conducted two evidentiary hearings— one on Appellees' motion for temporary injunction and one on their motion to hold Chase Bank in contempt—and Appellees had presented a great deal of evidence supporting their declaratory judgment and conversion claims. Moreover, Appellees' first amended petition specifically references Bookout's social media posts, including a specific video posted by Bookout, as a basis for Appellees' defamation claim. Given that these videos and social media posts were created by one of the Appellants, they were within the possession or control of Appellants, and the content was well known to them. Accordingly, they should have been aware of the evidence Appellees could marshal to establish a prima facie case of defamation. Thus, we cannot say that the trial court abused its discretion in finding Appellants' TCPA motion to be frivolous. *See Pinghua Lei*, 578 S.W.3d at 717–18.

Even if Appellants could show that their motion to dismiss was not frivolous, in order to prevail on their seventh issue, they must also show that the trial court erred in finding that their motion to dismiss was filed for the sole purpose of delay.

*See Sullivan*, 551 S.W.3d at 857. As Appellees point out, the record reflects that at the time the motion to dismiss was filed, Appellees were engaged in ongoing efforts to discover the whereabouts of and gain access to the funds Appellants had removed from Stedfast's bank accounts, which ultimately led to the filing of a motion to hold Appellants in contempt. As a motion to dismiss under the TCPA automatically suspends all discovery,[34] the trial court, given its familiarity with the parties and the goings on in the case, could have viewed Appellants' TCPA motion as a tactical maneuver designed to stonewall Appellees' efforts. Mindful that the trial court has a unique vantage point in overseeing this internecine conflict and is in the best position to evaluate circumstances which may not be readily apparent from a cold record, we cannot say that the trial court abused its discretion in finding that Appellants' TCPA motion was filed solely for purposes of delay. *See In re R.E.S.*, 482 S.W.3d 584, 587 (Tex. App.—San Antonio 2015, no pet.) (acknowledging "the principle that the trial court is in the best position to evaluate circumstances which may not be readily apparent from a cold record" in affirming trial court's award of attorney's fees in a case arising from a petition to modify the parent–child relationship established by a divorce decree); *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("We remain mindful that the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and

---

[34]Tex. Civ. Prac. & Rem. Code Ann. § 27.003(c).

influences' that may not be apparent from merely reading the record on appeal." (quoting *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.))).

We overrule Appellants' seventh issue.

## IV. Conclusion

Having sustained in part and overruled in part Appellants' first issue, we hold that the trial court may exercise subject matter jurisdiction over Appellees' claims; provided, however, that the following statements upon which Appellees base their defamation claim are not actionable under the ecclesiastical abstention doctrine: (1) any of Bookout's statements referring to Stedfast as a "cult" or to Shelley as a "cult leader" and (2) any of Bookout's statements referring to Shelley as a "sodomite" or similar statements by Bookout that according to Shelley "suggest that [Shelley] engage[s] in sexual activities that are condemned by the doctrines of [his] [c]hurch."[35]

Having overruled Appellants' remaining issues,[36] we affirm the trial court's order denying Appellants' motion to dismiss.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  November 23, 2022

---

[35] *See supra* note 10.

[36] As previously noted, because we were required to determine whether the TCPA applied to each of Appellees' claims in order to resolve Appellants' fourth, fifth, and sixth issues, we do not separately address Appellants' second issue. *See supra* note 6.